# IN THE COURT OF APPEALS OF IOWA

No. 23-2119
Filed September 18, 2024

**IN THE INTEREST OF L.A. and L.A.,**
**Minor Children,**

**L.H., Mother,**
        Petitioner-Appellee,

**L.A., Father,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Plymouth County, Daniel P. Vakulskas, Judge.

        A father appeals the private termination of his parental rights. **AFFIRMED.**

        Jay P. Phipps of Phipps Law Office, PLC, Moville, for appellee mother.

        Debra S. De Jong, Orange City, for appellant father.

        Chad Thompson, Kingsley, attorney and guardian ad litem for minor children.

        Considered by Badding, P.J., Langholz, J., and Gamble, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**BADDING, Presiding Judge.**

The father of two children, born in 2013 and 2015, appeals the termination of his parental rights under the ground of abandonment in Iowa Code section 600A.8(3)(b) (2023). At the termination hearing, the father testified: "These are my children. I am their father. I remember the times that I did have [with] them and the relationship I had with them, and I—I miss that a lot." But in the three years since he had last seen the children, the juvenile court found the father had done "nothing . . . to affirmatively step up as a parent."

The father challenges that finding, claiming the evidence was insufficient to establish the statutory ground for termination. He also claims that termination was not in the children's best interests and that his attorney provided ineffective assistance. We deny these claims upon our de novo review of the record and affirm the juvenile court's ruling.

## I. Background Facts and Proceedings

The mother and father were in an on-and-off relationship for nine years, during which their two children were born. Their relationship ended for good in early 2018 because of the father's substance use. The mother moved into her parents' home with the children, while the father found a one-bedroom apartment for himself in a nearby town.

With no custody order in place after they separated, the mother said the father's parents would contact her when they wanted to see the children: "It wasn't [the father] contacting me, it was [his parents] when they wanted to see them on weekends." The grandparents had the children at their house maybe twice a month for the next year or so. When the children were there, the father would

often—but not always—come to see them, according to the paternal grandfather who testified at the termination hearing.

This informal arrangement ended in September 2020 when the father pulled the oldest child "down the stairs by his shirt and shook him at the end of the stairs" at the grandparents' house. After that incident, the father testified, "I wasn't allowed to speak or talk to the children until we all went to counseling and therapy." The mother enrolled the child in therapy, and she testified the father was invited to attend but didn't. The father's memory was different. He testified, "it was sort of [an] invitation"; something "along the lines of 'after a while you can come to counseling with [the child] and be around him.'" In any event, the father never attended therapy with the oldest child. And he hasn't had any contact with either child since then.

The father testified that it was not for lack of trying. He sent the mother many text messages—for "[d]ays after weeks after months," with some just repeating her name to "try and talk to her about . . . the kids and the whole situation." The mother agreed, "He has sent me text messages, some asking about the children, some just saying my name repeatedly." She testified that the last message she received from the father was in June 2022, when he "just mentioned that he should see the children." The father thought his last contact with the mother was a phone call a year or two before the termination hearing, during which the mother said that she would talk to the child's therapist about visitation. But the father testified that "it never ended up going anywhere."

During this time, the father's life "kind of fell into devastation." He had a series of criminal convictions, which landed him in jail and then prison. Those

convictions included assault with a dangerous weapon, domestic abuse assault, and his third operating-while-intoxicated offense. The father had just finished a nine-month stint in prison before the termination hearing. He was paroled to a residential treatment facility and obtained a full-time job. The father testified that he had been sober for close to one year and was "doing well stabilizing" his life, although he still had another pending charge for domestic abuse assault.

Unlike the father, the mother's life with the children improved after their separation. In early 2020, she began dating her now-husband. They have one child together and another on the way. The mother's husband has assumed the role of dad for the children by, as he testified, being "there every day with them, I go to all the sport outings, provide them a safe and secure home, [and] involve them in my family's activities." The children are excelling in school, and they are involved in multiple extracurricular activities. In hopes that her husband would be able to adopt the children, the mother petitioned to terminate the father's rights in August 2023.

After the mother's petition was filed, the court appointed a guardian ad litem for the children. The guardian ad litem filed a report before the hearing, noting that he could not talk to the father because the father's court-appointed attorney did not respond to his request for contact information. But the guardian ad litem did talk to the children, the mother, and the stepfather. His report said that between 2020 and 2022, the father asked, "to talk and/or see the children approximately 10 times, but did not have any contact with them." The father had not asked for any visitation with the children in the past year. And, according to the report, the father "has never provided any financial or emotional support for the children." The guardian

ad litem concluded that termination was in the children's best interests because they "are healthy and are thriving in their current living environment."

Following a hearing in December, the court issued its ruling terminating the father's parental rights under Iowa Code section 600A.8(3)(b). The father appeals.

## II.   Standard of Review

"Private termination proceedings under chapter 600A are reviewed de novo." *In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020). We give weight to the juvenile court's findings of fact, especially concerning the credibility of witnesses, but we are not bound by them. *Id.*

## III.   Analysis

Terminations under chapter 600A require a two-step analysis. *Id.* The moving party must first prove a statutory ground for termination and then establish that termination is in the child's best interests—"both by clear and convincing evidence." *In re J.R.*, No. 23-1127, 2023 WL 8449501, at *3 (Iowa Ct. App. Dec. 6, 2023); *accord B.H.A.*, 938 N.W.2d at 232. The father challenges both steps. He also raises ancillary issues about the effectiveness of his court-appointed counsel. We will address each claim in turn.

### A.   Ground for Termination

The juvenile court concluded that the father abandoned the children under Iowa Code section 600A.8(3)(b) because he "completely rejected the duties imposed by the parent-child relationship by not providing for the children nor maintaining regular contact with them." The father challenges this conclusion, arguing that the mother "did not prove by clear and convincing evidence that [he] had financial resources and refused to contribute to the children." He also argues

the mother prevented him from contacting the children. We disagree on both counts.

Iowa Code section 600A.8(3)(b) provides that a parent is "deemed to have abandoned" a child six months of age or older if the parent fails to maintain "substantial and continuous or repeated contact with the child." The required contact must be shown by "contribution toward support of the child of a reasonable amount, according to the parent's means," and, if the parent has not lived with the child in the year before the termination hearing, by (1) visits with the child at least monthly when physically and financially able and when not prevented by the child's custodian or (2) regular communication with the child or their custodian when physically and financially unable to visit or when visits are prevented by the child's custodian. Iowa Code § 600A.8(3)(b). "These are two distinct components—an economic component and a contact component—both of which must be met 'to avoid being deemed to have abandoned the child.'" *J.R.*, 2023 WL 8449501, at *3. The father did not meet either.

Starting with the threshold element of financial support, the father points out "[t]here was never a child support order in place." But section 600A.8(3)(b) "is not limited to court-ordered support payments; those types of payments are the subject of a separate provision." *In re W.W.*, 826 N.W.2d 706, 710 (Iowa Ct. App. 2012); *see also* Iowa Code § 600A.8(4); *In re K.B.*, No. 22–0027, 2022 WL 3065365, at *2 (Iowa Ct. App. Aug. 3, 2022) ("Although the father was not required to make any child support payments under the modified dissolution decree, section 600A.8(b)(3) still requires him to provide support within his means."). Perhaps realizing that argument is foreclosed by our cases on the subject, the

father argues that after he and the mother separated in 2018, he moved out of the family's home that he had been making payments on, which he contends "was a definite financial benefit . . . in terms of them keeping the furnishings and the home." The mother, however, testified that she and the children moved in with her parents after the couple's relationship ended. So there was no financial benefit there.

The father next argues that in September 2022, he tried "to give the children Christmas gifts, Easter baskets, and birthday presents" that were sitting in his parents' basement closet "[f]or the longest time," but the mother and children had moved. We fail to see how stockpiling gifts that were never given to the children contributed to their support. *See K.B.*, 2022 WL 3065365, at *2 n.3 (finding that although the father had been saving gifts for the child at his home, he made no contributions to the child's support). We similarly reject the father's argument that the mother "[n]ever requested anything financially," and he was not "aware of any requirement to provide financially." "Nothing in the statutory language suggests the obligation to make financial contributions can be overcome by the custodial parent shunning that support," or the noncustodial parent's claimed ignorance of the need to contribute to the children's support. *In re J.G.*, No. 21-1836, 2022 WL 2347775, at *4 (Iowa Ct. App. June 29, 2022); *cf. In re R.T.*, No. 16–1343, 2017 WL 936189, at *3 n.8 (Iowa Ct. App. Mar. 8, 2017) (finding in "this limited situation—in which [the mother] did not have the means to provide for [the child], no child-support order was established, and the guardians did not request any financial assistance—[the mother's] actions did not meet the threshold element for termination").

Finally, the father asserts that he lacked the ability to contribute to the children's support because "he struggled with his mental health and drugs and alcohol," which led to "being in and out of" jail and prison. But even with those issues, the record shows that when the father was not incarcerated, he was employed. *See In re A.T.*, No. 17–1570, 2018 WL 2727799, at *2 (Iowa Ct. App. June 6, 2018) (noting that "incarceration alone cannot excuse the failure to pay," and even when not incarcerated, the father failed to contribute financial support). Indeed, the father testified that he found a job as soon as he was released from prison, which he quit just before the termination hearing for a better position with "really good" pay and benefits. Yet he still did not provide any support for the children. *Cf. In re E.S.*, No. 16–0066, 2016 WL 7403746, at *3 (Iowa Ct. App. Dec. 21, 2016) (finding that a mother provided adequate financial support to the child, in part, because she started paying support after she found stable employment). With these facts, we find the father abandoned the children under the threshold economic component of section 600A.8(3)(b).

While our analysis could end there, *see J.G.*, 2022 WL 2347775, at *3, we also find the father abandoned the children under the contact component. The father argues that component was not met because the mother prevented him from seeing the children after the incident in September 2020, when he pulled the oldest child down the stairs and shook him. The mother, however, testified that the father was asked to attend the child's therapy sessions, but he "did not show up for any." The father suggested it was more complicated than that, testifying, "I don't think there was ever an appointment that said 'be here on this date,' but there was something along the lines of 'after a while you can come to counseling with [the

child] and be around him." *See id.* at *4 (noting that a custodial parent may place reasonable restrictions on visitation). Regardless, even if the mother prevented the father from seeing the children, section 600A.8(3)(b) requires "[r]egular communication with the child or with the person having the care or custody of the child." That did not happen here.

While the father testified that he sent the mother multiple text messages "to try and talk to her about . . . the kids and the whole situation," the mother testified that the last message she received from the father was in June 2022. The father suggested that the mother did not answer any of his text messages, but he also testified about a phone call with her "a year to two years ago" when she agreed to talk to the child's therapist about visitation. That was the last time the father spoke to the mother. And after the September 2020 incident, the father's only written communication with the children was one letter that he mailed to the oldest child, which the mother testified she gave to him.

The record does not show the mother put a "blanket moratorium on contact," as the father argues. *Cf. In re K.P.*, No. 14–2068, 2015 WL 4644800, at *3 (Iowa Ct. App. Aug. 5, 2015) (finding no abandonment where the mother stopped taking the father's calls, admitted that she prevented the father from seeing the child, ignored the father's messages, and refused to provide him with her mailing address). The mother testified that she never prevented the father from seeing the children. And, while she did not give the father their new address, the paternal grandfather knew where they lived. All that said, we recognize the father (and his parents) encountered some challenges in trying to see the children. "But his minimal efforts to overcome those challenges and restart some communication" in

the three years before the termination petition was filed "do not demonstrate 'substantial and continuous or repeated contact' with his children." *J.R.*, 2023 WL 8449501, at *4 ("This lengthy period of minimal contact rises to the level of abandonment.").

## B.     Best Interests

The second step in our analysis, where we examine the children's best interests, "requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent." Iowa Code § 600A.1(2). Those duties include "the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life." *Id.* We also consider the children's physical, mental, and emotional needs and the closeness of the parent-child relationship. *In re Q.G.*, 911 N.W.2d 761, 771 (Iowa 2018).

In arguing that termination of his parental rights was not in the children's best interests, the father focuses on his past performance as a parent, noting that the children lived with him and the mother until their relationship ended. But that was five years before the termination petition was filed. In the years that followed, the father had minimal involvement with the children, which ended altogether in September 2020, after the father was abusive to the oldest child. *See In re A.M.*, 843 N.W.2d 100, 112 (Iowa 2014) (noting child safety is a paramount consideration in conducting a best interest analysis); *see also Q.G.*, 911 N.W.2d at 771 (recognizing we may look to chapter 232 and by extension cases interpreting that chapter to "flesh out the best-interest-of-the-child test" in chapter 600A

proceedings).  We agree with the juvenile court that allowing the father "to remain in the children's lives at this point would cause confusion.  He has been completely out of their lives for over three full years at this point.  Before that his contact was not always consistent."  *See J.G.*, 2022 WL 2347775, at *5 (noting the father's scant involvement in the child's life supported a finding that termination of his parental rights was in the child's best interest).  The children are in a safe, stable, and loving environment with their mother and stepfather, who plans to adopt them. *See In re G.A.*, 826 N.W.2d 125, 131 (Iowa Ct. App. 2012) (noting the stepfather's strong role in the child's life and desire to adopt supported a finding that termination was in the child's best interest).  So while we commend the father for his recent sobriety, we find that terminating his parental rights was in the children's best interests.

### C.    Ineffective Assistance of Counsel

Although both steps in our private termination analysis have been met, we must address the father's claims that his court-appointed attorney provided ineffective assistance by failing to (1) raise the issue of deficient service; (2) object to the guardian ad litem report; and (3) introduce evidence, call witnesses, object to hearsay, and make a closing argument.  *See In re B.G.*, No. 20–1189, 2020 WL 7022392, at *2 (Iowa Ct. App. Nov. 30, 2020) (stating that ineffective-assistance claims in termination proceedings must be raised on direct appeal since those proceedings have no procedural equivalent to postconviction relief).

Because termination of parental rights cases are civil proceedings, there is "no constitutional right to effective assistance of counsel.  Nevertheless, due process requires that counsel appointed pursuant to a statute provide effective

assistance. We generally apply the same standards for counsel appointed in a criminal proceeding to counsel appointed in a termination proceeding." *In re E.E.*, No. 21-0034, 2021 WL 3907807, at *4 (Iowa Ct. App. Sept. 1, 2021) (citation omitted). Those standards require the father to prove that (1) counsel's performance was deficient and (2) prejudice resulted. *Id.*

### 1. Proof of Service

The father first claims there was no proof of service of notice filed with the juvenile court before the termination hearing, as required by Iowa Code section 600A.6. He is correct—and counsel should have brought this notice issue to the court's attention. *See* Iowa Code § 600A.6(1) ("A termination of parental rights under this chapter shall, unless provided otherwise in this section, be ordered only after notice has been served on all necessary parties . . . ."), (6) ("Proof of service of notice in the manner prescribed shall be filed with the juvenile court prior to the hearing on termination of parental rights."). But even though counsel failed to do so, we conclude the father is not entitled to relief since he "fully participated in the proceedings represented by counsel, and he has not demonstrated prejudice resulting from" counsel's failure. *E.E.*, 2021 WL 3907807, at *5; *see also In re J.P.B.*, 419 N.W.2d 387, 390 (Iowa 1988) (noting that unless both deficient performance and prejudice are proven, the claim must fail).

### 2. Guardian ad Litem Report

The father next claims that his attorney should have objected to the guardian ad litem's report because the guardian ad litem did not comply with Iowa Code section 232.2(25)(b). That provision sets out the duties of a guardian ad litem for a child which, "[u]nless otherwise enlarged or circumscribed after a finding

of good cause," shall include obtaining first-hand knowledge of the "facts, circumstances, and parties involved" through, among other things, interviews with both parents and "any person providing medical, mental health, social, educational, or other services to the child." Iowa Code § 232.2(25)(b)(1), (4), (5).

The father argues the guardian ad litem never interviewed him or the child's counselor as required by section 232.2(25).[1] He is again correct. But the father once more fails to demonstrate how he was prejudiced by counsel's failure to object to the report, beyond arguing that "a full investigation would have . . . led to additional necessary information." The father does not identify what that "additional necessary information" would have been, noting it "is impossible to know," and we will not make that argument for him. *See Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996) ("[W]e will not speculate on the arguments [a party] might have made and then search for legal authority and comb the record for facts to support such arguments."). In any event, the juvenile court did not base its determination solely on the guardian ad litem's report, which it mentioned only once in its ruling, and neither do we. *See L.H.*, 2023 WL 5093285, at *2 n.5.

---

[1] The mother contends that section 232.2(25) does not apply in this private termination proceeding. Although we noted differently in *In re L.H.*, we need not resolve the question here because, as discussed above, the father failed to establish the prejudice prong of his ineffective-assistance claim. No. 23-0315, 2023 WL 5093285, at *2 n.5 (Iowa Ct. App. Aug. 9, 2023) (giving little weight to a guardian ad litem report in a chapter 600A termination because "section 232.2, defining the role of a [guardian ad litem] in matters such as these, requires that the [guardian ad litem] shall interview each parent"); *see also In re P.B.*, No. 22-1467, 2023 WL 3092505, at *7 n.14 (Iowa Ct. App. Apr. 26, 2023) (Tabor, J., dissenting).

### 3. Evidence, Witnesses, Objections, and Closing Argument

Last, in a catchall claim, the father contends that his attorney failed to offer any exhibits on his behalf, call witnesses other than himself and the paternal grandfather, object to hearsay testimony, or make a closing argument. We agree that counsel's performance "appears to have been half-hearted at best." *E.E.*, 2021 WL 3907807, at *5. Yet, as with the other ineffective-assistance claims, "[t]he father needs to demonstrate actual prejudice: that the result of the proceeding would likely have been different but for counsel's errors—i.e., but for counsel's errors, the court would not have terminated the father's parental rights." *Id.* Even though the father is hamstrung by the inability to develop a record—like would be afforded in a postconviction-relief proceeding—we conclude that he failed to establish prejudice after analyzing all his claims individually and cumulatively. *Id.*

While the father speculates on the additional evidence that could have been presented on his efforts to contact the mother and her efforts to block that contact, he does not discuss any evidence that would have impacted the threshold economic component of the abandonment claim. *See In re B.S.*, No. 05–0717, 2006 WL 3314386, at *2 (Iowa Ct. App. Nov. 16, 2016) (noting conclusory claims of prejudice are insufficient); *see also J.G.*, 2022 WL 2347775, at *3. Nor does he discuss any evidence that would have impacted the best-interests question. So while counsel could have done a better job representing the father, under these facts, we do not find the results of the proceedings would have been different but for counsel's errors. *See E.E.*, 2021 WL 3907807, at *6.

**IV.  Conclusion**

We affirm the termination of the father's parental rights under Iowa Code section 600A.8(3)(b), finding clear and convincing evidence that the father abandoned the children and termination was in their best interests.  We also find the father failed to establish prejudice on any of the ineffective-assistance claims he raised on appeal.

**AFFIRMED.**